Today is case number 4151023, The People of the State of Illinois v. Stetson-Crider. For the appellant, we have Amanda Ingram. And for the appellee, we have James Ryan Williams. You may proceed, Ms. Ingram. Good afternoon, Your Honors. Counsel, and may it please the Court, my name again is Amanda Ingram, and I represent Stetson v. El Crider. I would like to spend my time today on the first two issues from the brief, that the trial court should have granted counsel's request for a change of venue, and that social media photographs of Crider were irrelevant to prove the charge defense. It is well established in Illinois that a defendant need only show reasonable grounds to believe the prejudice against the defendant actually exists, and that by reason of this prejudice there is a reasonable apprehension that the defendant cannot receive a fair and impartial trial. It is true that the right to impartial jury does not require that jurors be totally ignorant of the case before trial. However, in some exceptional cases, such as this case, it is questionable whether the jurors could live up to their assurances that they can put aside preconceptions and decide the case based on the evidence at trial. The record of this case demonstrates, at a minimum, that there was a reasonable apprehension of prejudice sufficient to merit a change of venue. The Quincy Herald-Wig published an article about the case the Saturday before jury selection. The article was published above the fold on the front page with a color photograph of the prosecutor. It included a section entitled, quote, how it happened, and offered the state's version of events including allegations that Crider disposed of the gun,  and that Crider's father made remarks suggesting that they would have to get rid of the witness. The court acknowledged seeing the article and thinking that it would be, quote, problematic. Defense counsel told the court that numerous comments had been made to him, and that he believed the article had a severe impact on the prospective jurors. Unsurprisingly, given the publicity and the nature of the case, approximately 75% of the questioned individuals during the veneer had heard or read something about the case. Of the 12 jurors and four alternates, 10 had heard or read about the case beforehand. Juror Williams read the article and stated that he did not believe it was baloney. Juror Summers was the victim's lunch lady at his school. Both Williams and Summers were questioned after the court had denied the change of venue, so counsel knew he had to pick a jury from this pool and had to be judicious with his peremptory challenges. How many jurors were questioned in total? I think it was 44, approximately 44. Even though the jurors assured the court and counsel that they could be fair, it's highly questionable whether they could live up to their assurances. These well-meaning citizens undoubtedly had good intentions, but they should not have been placed in the position of passing judgment on this case, which naturally affected the community in which it occurred. So we're not to take the jurors at their word? No, sir. It's not that you're not to take the jurors at their word. It's simply that the inquiry doesn't stop there. Again, this was a tragic case. Jurors were naturally impacted, so when the jurors say they can be fair, you also have to take it into the context of what they were saying. For example, just as a taste of the answers these jurors were given, one potential juror, Reese, admitted to the court that she found it all very tragic and that she didn't think she was worthy to decide her case. I like to think I'm an open-minded person, but it's all so sad. It's all so close. It's in my county. It's on the streets that I walk on. Now, the trial court denied a challenge or cause for Ms. Reese. The state ultimately used a peremptory challenge against Ms. Reese, but that's the sentiment that was going on in this community that was reflected in the newspaper article. So, it's not simply that you don't take it. It's not that we're asking this court to say you can't take a juror's word, but you have to take the juror's word, but also understand that their word is being made in the context in which it's being made, where this is a terribly sad case. There's a lot of emotion, and there's a lot of sentiment surrounding it. The juror who expressed that opinion was removed. Was removed, ultimately, yes. Were there any jurors who served who indicated they could not be fair and impartial to both sides? None explicitly. Juror Williams was ultimately seated, and his comments were a little bit more, he's the one who read the article and did not believe it would be baloney. He ultimately said he hoped he could keep it out of his mind. He would try to keep it out of his mind. So, ultimately, all the seated jurors did say the right things. They gave the right answers to ultimately be seated and survive a challenge for cause. Did the defendant use all of his parameters? Yes, he did. Again, the overwhelming emotion and sentiment in the community rendered the circumstances such that it simply was not possible for jurors chosen from this community to remain fair and impartial. The fact that this was an oral motion should not impede the court from ruling in Crider's favor on the merits. Crider acknowledges that generally motions should be in writing, but as trial counsel argued at the time, the newspaper article was published on Saturday, Monday was a holiday, and he simply did not have time to draft a motion in time for court on Tuesday. Moreover, the state never objected at the time to the motion on the grounds that it was oral, and nor did the court make a note of that. The state responded on the merits, the court ruled on the merits, and I ask this court to do the same. If there are no further questions about the change of venue, I'll move on to the issue of social media photographs. It is a basic tenet of trial procedure that evidence must be relevant before it is admitted. In this case, the social media photographs of Crider taken from someone else's account were not relevant to prove any element of the charge defense. It's crucial to remember that the state convinced the trial court to admit the photographs under false pretenses. In the months before trial, defense counsel learned that the state intended to introduce social media photographs of Crider and moved to bar the state from doing so. The state convinced the court to allow the photographs by falsely arguing, quote, who put those on there, obviously the defendant did. The prosecutor continued, quote, he's provided that, he has put those on his Facebook, Instagram account, Snapchat, whatever it may be that were placed there. But it's there and remained there at the time of the shooting. In finding in the state's favor, the court relied on the state's false assertion that Crider himself had posted the photos to his own social media accounts. Well, if we assume that he didn't post the photos, does that mean the photos can't come in? I mean, did he deny that it was him? He didn't deny that it was him. But the question is, you don't even have to make that assumption. We know that those were not on his account. These were on the account of an Instagram user who went by the handle TSF Von Tate. And the record shows that these, not only was it somebody else's account, but these photographs were taken months before the shooting in Arizona with an entirely different group of people. There was no. And I understand that, but my question is, does that make, is that an ultimate bar to the evidence coming in just because he didn't post them? Well, I think it gets to the question of relevance. Were those photographs relevant to prove anything in this case, then maybe they would be allowed. But they have to first meet the bar of relevance. And there's simply no relevance to these photos, again, taken months before in another area with entirely different people that ties in any way to what's going on in this case that proves that Crider was the perpetrator in this offense and not somebody else. Did your client deny having a weapon? Deny having a weapon, no. He did not deny having a weapon. Well, he didn't testify, but the question wasn't necessarily whether he had access to guns. The question is, does this prove, and none of those guns that were showed in those photographs, none of that was alleged to be the gun that was used in this shooting. There's, the photographs simply don't show any connection to the offense in this case. This, the court, the court ultimately found, even when the defense attorney realized at trial that these were not from, these were not from Mr. Crider's account. These were somebody else's account. And when the trial, when the defense counsel started questioning the relevance of these, that's when the state made its argument that it's still, that it was still relevant to prove familiarity with guns. But again, familiarity with guns is not an issue in this case. There's no, there was no question about whether the gun perhaps went off accidentally or whether this was a reckless discharge or some circumstance that would warrant anything leading to whether somebody did or did not have familiarity with guns. Assume the defense had the posts prior to trial, right? It's, it's, it was definitely litigated prior to trial, but the defense counsel did not realize until trial that these were not, in fact, from Mr. Crider's own account. And again. How is it the state was able to determine that, but not the defense? It's not even that the state was able to. The, the, the pictures are clearly, when you look at them, they're clearly from this other person's account. So everybody knew that? Well, they perhaps would have known if they looked a little closer. But again, at the pretrial motion, you have the state arguing repeatedly that these are from Mr. Crider's account and not acknowledging that these are from somebody else's account, which admittedly would, would naturally cause confusion into where, where these photos were found. So was that issue re-litigated or re, re-addressed once it was determined they were not from his personal account? At the time when it, when it was brought up at trial, yes, it was brought up again. And the, the notion that these were actually from Mr. Crider's account was, was completely dropped. And that's when the issue shifted to whether they were relevant because they showed familiarity or access to guns at that time. Can I ask a question just to clarify? So you're making a distinction with regard to the defendant's familiarity versus access to a gun. Familiarity being not relevant and access being insufficient due to the pictures being from a different venue, different people. Is that your argument? Right. I mean, access and familiarity are, they're connected concepts, certainly, because if one has, has had, has had a history of access to guns, then might, they might naturally also be familiar with how they work and their use and everything. But again, the question of familiar, if, is familiarity with guns an issue? The idea of, of guns at all really wasn't an issue in this case because there was no dispute over the manner of death that a gun was used. And, and the, so the familiarity with guns was simply, you know, not relevant. The question really was who? The question was who did the shooting, not how did it happen? Was this a reckless discharge? Was it accidental? Was it intentional? But as it pertains to this defendant, the State's position is that it's reliable evidence that this defendant has been in contact and may know how to utilize weapons. So as it pertains to this defendant, that would be the argument for admissibility. As it pertains to this defendant, yes, he, he had access to guns many months before the shooting in another State, where again, and it's not like he was using those guns in a criminal manner. Those pictures are all young men acting in a, like rap style videos. They're, they're essentially, they're, they're playing. They're making these photos and videos. They're not in the course of a crime or anything like that. They're almost using the guns as props. They're not using them to, for, for any purpose other than to, to make themselves look in a certain way. And again, these were photos that there's no, there's no way to know that Crider, and yes, he, he may have purposely posed, which is the ultimately why the court allowed them, but the fact that he purposely posed doesn't go far enough to establish their relevance, particularly where we don't know if he knew that this T.S.F. Bonte person was planning to post them. We don't know, there's no indication that Crider followed this account, whether he liked these photos or commented on these photos. So these photos are coming from somebody else's account from months before. Well, they weren't taken surreptitiously. They were not taken. He posed for them. Right. He did pose for them. He was able to assume that he understood that these were posed photos that somebody was taking, and he's going to assume they're going to get posted, right? Well, I don't know that it's fair to assume that they will get posted. I mean, they're certainly making these videos, but I don't know if, but it's unclear to say that he knew at the time they were making these videos that this other guy was going to post them in that way. So I don't think it's fair to, to lay that assumption onto him, that simply by posing for photos, and again, for these photos, they appear to be playing, making videos. They're making rap style videos and photos. It's nothing about that would cause, would make a connection to a shooting several months later. The only purpose of letting a jury see these photos is to, is to prejudice the jury against them, to show him in these unflattering photos in an extremely negative light. And it all, and it compounds the error of the change of video, because again, this is a, I mean, sorry, the change of venue, because this is a jury who is by the natural sentiment in the community in the wake of this case is already trying to see him in a negative light. And then here come these photographs that, again, are unflattering and negative, and I think the average juror would see him in the negative light that the state intended to show him in, which is probably why initially the state used the, hey, that was his, that was the state's exact argument when putting it in, was he's putting himself out there when he points photographs or points a gun at the world, and puts those there, and puts those there for all the world to see and enjoy at the time of the shooting. He has not only provided the foundation for the admission, unless he can show it has been doctored, but he's, but he's produced the relevance, which is really the issue. So, I mean, the state is arguing that he's put himself out there, he's posing for these pictures, the state wants the jury to see him in this light. And again, this is, this was gotten into under false pretenses initially. Well, he apparently wants himself to be seen in this light, because he's posing. I'm going to make sure I understand the pictures. These aren't simply just shots taken of the video. They have stopped whatever video production they are making, and they've actually made the pictures themselves. Right, they're still. So he's posed for those pictures. Right. But again, these are, these are pictures that are in the course of dressing in a rap style, making photos and videos. This has absolutely nothing to do. Which they're apparently doing for some secret society that no one is ever supposed to see or know. It's unclear. It's unclear. I mean, we know that this Bonte user posted them. I don't think either we or a jury or the trial judge is supposed to completely disregard our own common sense and take into consideration the fact that if the defendant is posing for these photographs and making videos, that his intention is that this image gets projected to the public in the fashion he wants it to be projected. You're contending that, oh no, that's something he probably never even thought of. No, I'm saying it's simply not relevant to prove the charge defense in this case. His accessibility, his access to multiple firearms is not relevant. It's not relevant, because again, the fact that a firearm was used was indisputed. So the only purpose of putting these photos in was to prejudice the jury against Mr. Kreider. I have a question. I know you said that the weapon used in the shooting was not depicted in the photos. Did the photos depict the type of weapon used in the shooting, do you know? I do not know that off the top of my head. I think there were multiple types of weapons portrayed in the photos, whether those were of the type that was actually used, I'm not certain. It's possible. If there are no further questions, may I briefly conclude? Your Honors, this was undoubtedly a tragic case in a small, close-knit community. The citizens of Adams County had a right to know about the events in their area, but should not have been put in the position of judgment for an event so close to home and so emotional for so many. A change of venue was warranted, and the trial court abused its discretion by not granting one. This error was compounded by the State's underhanded attempt to introduce unflattering photos of Kreider, knowing that they were taken months before in another State with other people and posted to someone else's social media account. These photos were allowed under false pretenses and served only to paint Kreider in a negative light in front of a jury that was primed to see him in such a way. On behalf of Mr. Kreider, I ask this Court to reverse this conviction and remand for a new trial. Thank you. Thank you, Counsel. You will have additional time on rebuttal. Mr. Williams? May it please the Court, Counsel. My name is James Ryan Williams, and on behalf of the State's Attorneys Appellate Prosecutor, it is my privilege to represent the people of the State of Illinois before this Honorable Court. The Defendant focused on Arguments 1 and 2, so I'll do the same, unless, of course, the Court has any other questions, I'm prepared to address the other arguments. So with respect to the change of venue, Defendant's first argument, the State would first point out that case law supports that this Court can affirm on the basis that the Defendant failed to comply with the statutory procedure for seeking a change of venue and that he failed to file a written motion supported by affidavit. Now, the Defendant points out that he didn't have time to do this in the three or four, I think three days after the article was published, but despite doing so, he nevertheless failed to ask for a continuance to comply with the statutory requirements. Now, with respect to the merits... Was he offered one? I'm sorry, Your Honor. Was he offered a continuance? I don't recall off the top of my head. I apologize. With respect to the merits of the arguments, the Defendant argues that a reasonable apprehension existed, that he could not get a fair trial for two reasons. First of all, he points out that some of the jurors had heard or read about the case, and then he also points out that some of the jurors were affected by an outburst that occurred during trial. Did the State's attorney participate in the newspaper interview? I believe so. I don't recall specifically, Your Honor. Do you think that maybe that was a bad idea, the weekend before an emotionally charged homicide trial, to participate in a news interview that he knows is going to get published in his county, just before jury selection? That was a questionable decision. Now, with respect to the jurors' knowledge of the case, from having read or otherwise heard about the case, it's well established, as this Court has discussed earlier today, that the jurors do not have to be completely ignorant of the facts of the case. Instead, they simply have to be able to disregard any preconceived impressions and judge the facts of the case fairly and impartially. And here, as the Court explained, it went through an unusually tedious and lengthy selection process, where I think at least 44 jurors were considered. And of the 12 that were seated in the alternates, every one of them assured the Court that they could judge the facts fairly and impartially. And case law is well established that jurors should be believed when they make such an avearment or assertion. Our jury system is essentially predicated on that notion. Here, the defendant points out that this was a tragic case, but it's a murder case. Every murder is, by definition, tragic. So, the idea that, you know, if counsel's argument, if this Court buys the counsel's argument, it would seem then that every murder case would have to be changed. Because every murder case is tragic, and probably every murder case is reported in the local newspaper. But again, all of the jurors explicitly assured the Court that they could judge the facts of the case fairly and impartially. And again, case law provides that jurors are supposed to be believed when they make such an assertion. It's also worth noting that the Court did separately instruct the jury that news is not evidence. Now, with respect to the outburst, it wasn't discussed today, but it was discussed in the briefing. I don't really see how this in any way relates to the media coverage or prejudice in the community, as noted in the briefing. Any friend or family member that was willing to disrupt proceedings would probably be willing to go wherever those proceedings are held. In its reply brief, the defense argues that people in a different community would somehow be less affected by such an outburst, but offers no authority for that proposition. And here, again, nothing in the record indicates that the limited media coverage that is expected, again, almost any murder is probably going to involve some degree of media coverage. Nothing in the record suggests that actually denied the defendant the right to a fair trial or that the Court abused its discretion in denying the motion to change venue. With respect to defendant's second argument regarding the social media photos of the handguns, again, the Court did not abuse its discretion in admitting the photos of defendant posing. Counsel, let me ask you, was the issue of accessibility to a weapon, was that an issue in the case? No, I don't believe it was, Your Honor. Do we know whether or not the weapons depicted in the photos were real? I don't believe the defendant has disputed that they're real. And I do believe that at least one of the witnesses testified that the witness recognized one, or, excuse me, recognized a photo or a gun in a different photograph that may have been the murder weapon, a .40 caliber handgun. So the type of weapon actually used was one of the weapons depicted in the photos? Is that what you're saying? I'm not saying it was the weapon, but that style of weapon? Just to be clear, Your Honor, are you referring to whether it was, for example, a handgun versus a long gun? Semi-automatic versus a pistol. Right, any of those. Yes, yes, yes. Okay, I'm sorry. Yes, so the point here is that the photos depict the defendant on seemingly five different days, five separate occasions with what appear to be at least five separate semi-automatic handguns, and then, of course, the victim here, Ray, was murdered with a .40, .38, or .40 caliber handgun. Now, and, of course, as noted in the briefing, exactly tying the murder weapon to one of these guns in the photograph proved difficult because the defendant threw the murder weapon into the Mississippi River, and, unfortunately, investigators were never able to recover it. Now, here, again, I'll note that, as I pointed out in briefing, the defendant here is not arguing that these were unfairly prejudicial or that the prejudice substantially outweighed the probative value. What defendant is arguing is that they simply lack no relevance at all, and evidence is relevant if it has a tendency to make the existence of a fact that is a consequence of the determination of guilt more or less probable. And here, the photos, again, they depict these photos or evidence that tend to show that the defendant had a familiarity with numerous handguns in the time just before the murder. And that, the State's position is that is a fact of consequence of the determination of whether or not he could have been the individual who shot Ray Sean. Now, so first of all, I'll note that… So anyone who has photos on Facebook or put something on Snapchat or Instagram with weapons, that proves that they have ready access and possibly shot someone? If an individual has posted numerous photographs of them having access to numerous different handguns, I believe that's relevant to the determination of whether or not that individual could have murdered someone with a handgun. Now, the defendant points out here that these photographs were initially introduced under false pretenses or a false assertion. To that point, I would note, first of all, I mean, there's a difference between something being purposely false and simply mistaken. And second of all, as Your Honor pointed out, right on the photographs, it states who posted, you know, who posted them. So how was the State mistaken? I honestly don't know, but perhaps it's just simply their unfamiliarity with social media and that sort of thing. But in any event, it was readily discoverable by the defense, and it appears to me, at least reading the record, that this is not a willful false assertion on the part of the State, but simply a mistake. And in any event, you know, a lot has been made about, like, you know, who owned the social media accounts, who posted the pictures, who took the pictures. But frankly, I've not seen, and I don't believe that the defense has produced any sort of authority showing how that somehow bears on the relevance of the picture. I don't see how that in any way alters the analysis. Again, the pictures demonstrate that in the time just before the murder, this individual had ready access to seemingly at least five different semi-automatic handguns. Just before or months before? To be clear, months. I mean, I think it's – there's quite – there is some dispute about how many weeks it was, and I don't recall off the top of my head. Would it matter if it was years? I think that that – I think that the length of time, as the court found here, I think that principally goes to the weight, not necessarily to the relevance. Now, in any event – So no one's contending that the victim wasn't shot with a handgun, with a gun, right? Correct. There isn't any issue about cause of death. There's no issue about the circumstances under which the death occurred. The defendant hasn't given a statement saying, I don't have a gun, never had a gun, don't know anything about handguns. The defendant, in fact, doesn't even testify. So what's the relevance of the pictures? Again, Your Honor, I believe that they're relevant simply to establish that he could have been – he could have possessed the gun. And in any event, even if these photos are relevant, even if – although it was not argued, even if they're more prejudicial than probative, at the end of the day, this error is harmless. I would first note that – Before you go there, let me ask you this. I know that there was a detective that testified about, I believe, speaking with the defendant. In speaking with that detective, did the defendant make any type of statement related to access to guns or denial of access to guns or anything like that? If I'm not mistaken, Your Honor, I believe that he admitted to the detective – and I think it was during the initial interview – I believe that he admitted that he did own, or at least had previously owned, a variety of different handguns. So no denial of access to a weapon. You're saying he admitted. I believe that's accurate, Your Honor. So, again, even if this is irrelevant, even if it is perhaps more prejudicial than probative, in any event, this error is harmless. First of all, the defense argues that we have to prove – the State, that is – has to prove that this is harmless beyond a reasonable doubt. But as this Court has previously explained, that standard only applies if the error implicates a constitutional right. Here, at worst, this would be a violation of a rule of evidence. So the governing standard there is that the defendant has to show a reasonable probability that he would have been acquitted absent the erroneous admission. Here, the defendant does not argue reasonable doubt on appeal, does not argue closely balanced evidence. He does not dispute having a handgun. He does not dispute being one of the two individuals that gets out of the car. The only argument here is that the jury had reason to question his guilt because Deshaun Parker was the other of the two individuals that got out of the car. Now, to that end, it must be pointed out that it was the defendant who got in the fight that night with – I believe it was KT – who was extremely upset with KT. Deshaun Parker, on the other hand, was not involved in the fight and, in fact, was not even at the club during the fight. After the murder, Deshaun Parker goes to the hospital to be with Ray and his family while the defendant, who notably was actually related to Ray, flees into hiding. He deactivates his Facebook account, which I believe one person testified had pictures of him with possibly the murder weapon. He turns off his phone. Similarly, Deshaun Parker goes to the funeral, pays his respects. Is there any evidence that is not circumstantial? Well, I mean, I guess that would be the testimony of Deshaun Parker, who – well, a couple of the individuals in the car testified that the defendant was the first to get out, and then Deshaun Parker testifies that he hears the gun going off. So I would say that that would be direct evidence that it was the defendant who fired the gun. To that end – It sounds circumstantial to me. Well, in any event, this Court has repeatedly held that a murder conviction can be upheld on circumstantial evidence. One more question. I'm trying to determine. You said that it wasn't a closed case. It looks to me like the entire case is circumstantial evidence. I don't know that that makes it by definition a closed case. Frankly, the circumstantial evidence in this case is pretty overwhelming. Numerous people saw the defendant with a handgun that night. One person believed it was a .40 caliber, which happened to be the caliber of the bullet that killed him. I think he made some comments. Right, and yes, that's what I was going to get at. Above all else are the numerous incriminating comments. I'm going to paraphrase slightly here, hopefully for obvious reasons. The defendant told his friends before the murder that he was going to pop someone in the head. Again, paraphrasing. After he did so, he boasted that he had in fact popped someone in the head, explaining he believed that it was KT because KT was wearing a red hoodie that night. Unfortunately, so was Ray. After he learned that it was Ray, he admitted solemnly that he thought he had murdered the right person. He later calls up Deshaun Parker, advises him not to talk to the police, to just write it out because it's no-face, no-case. Perhaps most damning, when the detective, during the second interview, ultimately confronts him with the fact that we now know that it was Deshaun Parker out there with you, the defendant asked the question, when I did it? I would invite the court to review that video in the context in which he makes that statement. Again, numerous incriminating statements. That's in addition to the fact that there was the eyewitness to the murder who testified that the shooter was wearing gold chains and had a distinctive blonde streak in his hair. Numerous, multiple eyewitnesses testified that that matched the defendant's description, the gold chains and especially the blonde streak. Notably, right before his final arrest, he eliminates the blonde streak from his hair. Unless there are any further questions? I don't see any at this time, counsel. Thank you, Your Honor. Thank you. Any rebuttal, Ms. William? I'm sorry, Ms. Ingram? First, the idea that every murder... I'm sorry, but can I stop you and just ask you, can you tell us definitively the time frame of when these photos from social media, when they were taken or posed for versus the trial or the incident? There's information in the record that the photos were uploaded some approximately 30 weeks before the state, before the police got them. It's the exact date of when they were taken wasn't established. They're able to figure out when the photos were first posted to that social media account to the time when the police got them. So there's not a precise answer, but it's somewhere in the neighborhood, I think, of somewhere between maybe 25 to 30 weeks, and that's an approximation. And how does that relate to when this incident occurred, though? To when the incident occurred? Yes. It would have been, it still would have been many weeks, if not at least a couple or three months before the shooting occurred. Okay, thank you. The idea that every murder case in a small town would warrant a change of venue is absurd. If for simply the sake of argument, imagine for a moment that the victim that night had not been a 12-year-old young boy, but had in fact been K.T. or Little Henry or one of those other fellas who were known as troublemakers in the area. Do you think that the average citizen in the area would have been as emotional and sad and upset about two young men with guns as is the sad case of many today, but it's simply qualitatively different when you're dealing with a 12-year-old boy who is the victim of a shooting? It simply is absurd to think that a finding that a change of venue was warranted in this case would be warranted in every single murder case in a small town. Second, to answer Your Honor's question about whether there was a continuance, the answer is no. There was not a continuance offered. That's in the record of page 739 through 740. The idea of whether regarding the social media photographs, whether this was a mistake or purposeful, there's zero indication that this was a mistake on the State's Attorney's part. When it came up, when Defense Counsel first realized it and brought it up, the State's Attorney didn't say, hey, I'm sorry, I made a mistake, I didn't realize anything. He didn't say anything at all. He just dropped it. And I think that is the biggest indication that that was not a mistake. It was, in fact, a purposeful in order to get those photographs in. And the State now admits that access to guns was simply not an issue in this case, which further supports Kreider's argument that these photos were not relevant. The remaining evidence against Kreider was not overwhelming. The jury had many reasons to doubt the State's version of events. Again, Parker had a long history of violent encounters with K.T. and Little Henry, and he may have not been in the bar that night, but he was just as drunk as the other. He was armed, he was in the car, and he was in the alley, too. He did go to the funeral, but he was also noted as acting real paranoid, and he also fled the area. Everybody scattered in the wake of this event. Furthermore, while Kreider allegedly made numerous unfortunate comments about this case, how do we know about those comments from Parker and Reynolds, both of whom were granted immunity deals? Immunity inherently involves a significant amount of involvement from the State. And finally, there's Helen Horton's testimony, which, again, she's related to Anthony Reynolds. She claimed to be able to see things from across the street at night. Her testimony is simply not enough to overcome the circumstantial evidence. And I agree with opposing counsel that I do encourage you to view the video of Mr. Kreider's interview, because the idea that his statement, when I did it, when heard on the video, is some kind of confession, it's simply just not true. When he was responding to that, when the detective was saying, you know, we know when you did it, or whatever the question was to prompt this response, he said, when I did it, it was totally incredulous. It was in no way a confession. And, in fact, it was never even used at trial as a confession. So with that, Mr. Kreider, again, asks this Court to reverse his conviction and remand for a new trial. Thank you, Honors. Thank you, Ms. Ingram. Mr. Williams will be in recess and take this matter under advisement.